UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
HAYMATTIE ESAR,

                    Plaintiff,

        -against-

JP MORGAN CHASE BANK N.A. d/b/a CHASE and
JP MORGAN CHASE,

                    Defendant.
------------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**15-CV-382 (NGG) (PK)**

NICHOLAS G. GARAUFIS, United States District Judge.

      Plaintiff Haymattie Esar brings this suit against Defendant JP Morgan Chase Bank N.A.

("Chase") claiming discrimination based on her national origin, age, and disability, as well as

interference with her right to take intermittent medical leave. Plaintiff alleges that Chase

violated her rights under the following laws: Title VII of the Civil Rights Act of 1964 ("Title

VII"), 42 U.S.C. § 2000e et seq.; the New York State Human Rights Law ("NYSHRL"), N.Y.

Exec. Law § 296 et seq.; the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin.

Code § 8-101 et seq.; the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C.

§ 621 et seq.; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.; and the

Family Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 et seq.

      Before the court is Defendant's fully briefed motion for summary judgment. (Def. Mot.

for Summ. J. ("Mot.") (Dkt. 30); Mem. in Supp. of Mot. ("Mem.") (Dkt. 31).) For the following

reasons, the motion is GRANTED and the case is DISMISSED WITH PREJUDICE.

# I. BACKGROUND

## A. Facts

### 1. Plaintiff's Background and Early Employment History

Defendant Chase operates a commercial and consumer banking business with retail branches throughout this district. (Def. Rule 56.1 Statement ("Def. 56.1") (Dkt. 32) ¶¶ 1, 3.)[1] Long before the current suit, Chase acquired Washington Mutual, which had previously merged with Dime Savings Bank, and converted Washington Mutual retail locations to Chase branches. (Id. ¶ 3.)

Plaintiff was born in 1963 and is of Guyanese national origin. (Id. ¶ 2.) She began working for Dime Savings Bank as a part-time teller in 1990. (Id. ¶ 3.) By 2002, she was working as an "assistant branch manager" at a Washington Mutual branch in Rego Park and, in 2007, she was transferred to fill the same role at a branch in Kings Plaza. (Id. ¶ 3.) In 2009, as a result of Chase's acquisition, the Kings Plaza location became a Chase branch and Plaintiff's title was changed to "assistant branch manager – sales." (Id. ¶ 4.) Around October 2010, Plaintiff transferred to become an assistant branch manager at Chase's Kings Highway branch as her position was no longer needed at the Kings Plaza branch. (Id. ¶ 5.) As an assistant branch manager, Plaintiff worked with the branch manager to oversee general management of the branch and handled scheduling, performance reviews and employee coaching, various branch audits, and similar duties. (Id. ¶ 7.)

When she worked at the Kings Highway location, Plaintiff received a "documented coaching" from her branch manager and district manager for her "lack of judgment during extreme circumstances" as exhibited in her "failure to secure $15,000.00 in cash in accordance

---

[1] Unless otherwise noted, the relevant facts set out in Defendant's Rule 56.1 Statement and cited in this section are undisputed by Plaintiff. (See, e.g., Pl. Resp. to Def. 56.1 (Dkt. 36-1) ¶¶ 1, 3.)

with procedure, which resulted in this money being stolen during a robbery on December 30, 2010." (Id. ¶ 21.) In response to that coaching, Plaintiff submitted a written statement "blaming" the loss on "the branch being busy and short-staffed at the time of the robbery." (Id. ¶¶ 21-22.) She apologized "if [she] didn't take the appropriate steps" and concluded by stating that "no one is perfect." (Documented Coaching (Dkt. 34-1 at ECF p.18) at ECF p.21.)

In light of that incident and other "performance problems," including her actions during the robbery and her "being too friendly with her subordinates," Plaintiff received a "Needs Improvement" on her 2010 performance review. (Def. 56.1 ¶ 23; Pl. 2010 Performance Review (Dkt. 34-1 at ECF p.22).) On her 2011 performance review, she received an average rating of "Meets Expectations," with supervisory comments noting that she did a "good job delivering great customer experience" but that she "need[ed] to be more firm with her staff and hold them accountable" and that she "need[ed] to spend more time observing and coaching." (Def. 56.1 ¶ 25; Pl. 2011 Performance Review (Dkt. 34-1 at ECF p.26) at ECF pp.27-28.)

2.   Plaintiff's 2012 FMLA Leave

In April 2012, Plaintiff's daughter was diagnosed with kidney disease. (Compl. (Dkt. 1) ¶ 19.) Soon thereafter, Chase granted her leave under the FMLA for a continuous twelve-week term beginning July 16, 2012, and ending October 7, 2012. (Def. 56.1 ¶¶ 13, 20.) Plaintiff asserts that she only took the full three-month FMLA leave because Chase denied her request for intermittent leave. (Compl. ¶ 19.) Chase states that "Esar's daughter's doctor left blank the section to be filled out if the employee was requesting intermitting leave" and that the doctor "estimated that Esar would need to take leave for three to six months to take care of her daughter." (Def. 56.1 ¶ 17.)

3.    Plaintiff's Work Following Her FMLA Leave

Plaintiff returned to work from her FMLA leave on October 9, 2012. (Id. ¶ 20.) At this point, there was no branch manager at the Kings Highway branch. (Id. ¶ 39.) Anoush Gabrielian, a branch manager in training, was being trained to take over management of the branch. (Id.) Plaintiff and Ida Buyanovskaya ("Ida") served as assistant branch managers and effectively managed the branch until "approximately mid-December 2012 to January 2013, . . . when Gabrielian became fully trained and took over running the branch as the branch manager." (Id. ¶¶ 39-40.)

On November 19, 2012, roughly a month after her return from leave, Plaintiff received a written warning from her district manager, Erica Slocum, regarding a failed branch audit that occurred during her leave in early August of the same year. (Id. ¶ 26.) Plaintiff was reprimanded for not properly securing her keys before taking leave in July and thereby "fail[ing] to successfully maintain the operational integrity of the branch." (Id.) Plaintiff disputes Chase's contention that she left her keys in an unlocked desk drawer, but does admit that she did not follow the proper procedures in securing her keys. (Id.; Pl. Resp. to Def. 56.1 ("Pl. 56.1") (Dkt. 36-1) ¶ 26.) Prior to the failed audit, Plaintiff had called a human resources representative and expressed that she felt "stressed that she [would] not be ready for her audit" and expressed a "willing[ness] to step down to a part time position." (Def. 56.1 ¶ 27.)

Plaintiff received an overall rating of "Low Meets Expectations" on her performance review for 2012. (Id. ¶ 28; Pl. 2012 Performance Review (Dkt. 34-1 at ECF p.38).) She received a "Meets Expectations" rating for the Customer Experience and Teamwork sections of her performance review, and a "Low Meets Expectations" rating for the Work Approach section of her performance review. (Pl. 2012 Performance Review at ECF pp.39-40.) In the Work

Approach section, Plaintiff was told "to focus on balancing her cashbox at the end of the day properly" with the failed audit being cited as support for this command. (Def. 56.1 ¶¶ 28-29; Pl. 2012 Performance Review at ECF p.40.)

On January 16, 2013, Plaintiff switched positions from assistant branch manager to part-time teller working thirty hours per week. (Def. 56.1 ¶ 41.) Plaintiff made this change because she could no longer arrive early to open the branch if needed, given the requirements of caring for her daughter. (Id.) Plaintiff states that she had sought permission from Chase to arrive late and leave late in order to maintain her position as an assistant branch manager, but that Chase denied this request. (Pl. 56.1 ¶ 41(b); Pl. Dep. Tr. (Dkt. 38-1) at 128:15-25.) After the denial of her request, Plaintiff agreed to take part-time work as a teller and ultimately signed a "Position Change Request" form stating that she requested the change "voluntarily and of [her] own free will." (Def. 56.1 ¶ 41; Jan. 11, 2013, Position Change Req. (Dkt. 34-3 at ECF p.20).) Plaintiff disputes the voluntary nature of her signature, stating that she felt that "she had no choice but to take the part-time teller position if she was to remain with the bank." (Pl. 56.1 ¶ 41(b).) Plaintiff nevertheless does not dispute that she had called human resources several months prior and expressed that she was "willing to step down to a part time position." (See Def. 56.1 ¶ 27.) After her change of position, Plaintiff was one of four tellers, two of whom were of Russian national origin and one of whom, Paulette Narine, identified as African American. (Id. ¶ 51.)

4.    Plaintiff's Mistreatment by Gabrielian

Gabrielian became branch manager at some point between mid-December 2012 and January 2013. (Id. ¶ 40.) Shortly after assuming control of the branch—and both before and after Plaintiff switched roles from assistant branch manager to part-time teller—Plaintiff alleges that Gabrielian began mistreating her. (Id.) Plaintiff alleges that Gabrielian mistreated her by:

- asking Plaintiff in front of coworkers and customers to fix her appearance even though her appearance was not unprofessional (id. ¶ 53);
- directing Plaintiff to exclusively perform demeaning tasks that were previously and more properly divided between the branch manager and both assistant branch managers, including cleaning up the lobby where a homeless man regularly urinated (id. ¶ 44) and emptying boxes of supplies (id. ¶ 47); and
- asking Plaintiff, and not Ida, to cover as an assistant manager at Chase's Bath Beach branch during the week of Christmas in 2012 (id. ¶ 48).

Plaintiff believes that she was treated less favorably than Ida, but notes that she does not believe this mistreatment occurred on account of Plaintiff's age, which is twelve years younger than that of Ida. (Id. ¶ 50.)

The alleged mistreatment continued during Plaintiff's tenure as a part-time teller. After assuming that position, Plaintiff learned from her Russian-speaking coworkers that Gabrielian often referred to her in the third person with Russian terms for "old lady" and "witch." (Id. ¶ 52.) Gabrielian also excessively criticized Plaintiff for various matters (id. ¶¶ 53-58), and was allegedly stricter with Plaintiff when it came to lunch and coffee breaks, feeding the parking meter during the work day, and days off (id. ¶¶ 59-61). During the two-and-a-half months that Plaintiff worked in 2013, she took ten days off: four sick days, one sick/emergency day, one personal day, and four undescribed days. (Id. ¶ 62.) On the advice of human resources, Gabrielian coded eight of these days as unscheduled and two of them as scheduled. (Id. ¶¶ 62-63.) Gabrielian did not discipline Plaintiff for "any of the issues that [Plaintiff] felt Gabrielian had with her." (Id. ¶ 66.) Plaintiff was also not disciplined for excessive absenteeism, though she was warned that she could be disciplined in the future if this pattern continued. (Id. ¶ 64.)

5.  Plaintiff's Communications with Human Resources in Early 2013 and Subsequent Leave

From January 2013 to early March 2013, Plaintiff spoke with a Chase human resources representative named Beth Wilson "a couple of times" about her problems with Gabrielian. (Id.

¶ 67.) Plaintiff maintains that she told Wilson that Gabrielian's treatment of her had to do with Plaintiff's age and national origin, an opinion that she also expressed to District Manager Slocum. (Pl. 56.1 ¶ 97-98.) On February 18, 2013, Plaintiff expressed displeasure with her position change and schedule and sought assistance in finding a position at another branch closer to her house in Queens that had parking and could accommodate her need to reduce her hours to 20 hours per week. (Def. 56.1 ¶ 68.) Wilson called Plaintiff back the following day to let her know that she would need more time to find a branch with a business need for Plaintiff that fit her stated criteria. (Id.) In subsequent calls, Plaintiff expressed discouragement at the possibility of finding a new position and said that she did not think Gabrielian wanted her at the branch. (Id. ¶ 69.) At no point did Plaintiff complain to Wilson of mistreatment based on age, race, national origin or disability. (Id. ¶ 70.) Plaintiff subsequently interviewed with several other branches but was not hired. (Id. ¶¶ 71-72; Pl. 56.1 ¶¶ 99-101.) Around this time, Plaintiff had at least one conversation with Gabrielian about the way Gabrielian was treating her; Gabrielian said that she would try to go easy on Plaintiff. (Def. 56.1 ¶¶ 73-75.) Plaintiff also told Gabrielian and human resources that she was having trouble adjusting to being a teller in the branch where she was previously part of management. (Id. ¶ 76.)

On March 6, 2013, Plaintiff returned home from work and "became ill, was overcome with depression and anxiety, and was having nightmares and not concentrating." (Id. ¶ 77.) Five days later, following one personal day and two sick days, she requested and was granted a leave of absence. (Id. ¶ 78.) She was eventually granted short-term disability benefits from March 18, 2013, through September 5, 2013. (Id. ¶ 79; Pl. Claims for Short Term Disability Benefits (Dkt. 38-2 at ECF p.3).) In connection with this request, Plaintiff was evaluated by Lea Boriskin, LCSW, at the New Horizon Counseling Center. (Def. 56.1 ¶ 81.) Boriskin noted that Plaintiff's

presenting problems were due to "her complicated family situation," and listed among the precipitating factors Plaintiff's assertion that her "[j]ob was not accommodating." (Intake Summ. (Dkt. 38-2 at ECF p.8) at ECF p.9.) A subsequent evaluation was performed by Dr. Edith Raagas, a psychiatrist with the New Horizon Counseling Center, who stated that Plaintiff's inability "to concentrate and focus at the workplace" was "a consequence of family problems." (Psychiatric Evaluation (Dkt. 38-2 at ECF p.12) at ECF p.14.) Boriskin and Raagas sent subsequent letters to The Hartford, Chase's short-term disability administrator, in support of Plaintiff's claim for short-term disability benefits. (Def. 56.1 ¶¶ 83-84.) None of the reports or letters prepared by Boriskin or Raagas stated that Plaintiff's depression stemmed from "any discrimination and/or retaliation on the basis of age, national origin, or race." (Id. ¶¶ 81-84.)

6.     Plaintiff's Termination

Around the time that Plaintiff took her leave of absence, she was involved in three incidents at the bank that merited follow-up by Chase. First, on February 25, 2013, Plaintiff incorrectly processed a check for $1282.00 as $12.82.00, and processed a cash back of $1100.00 for the same customer that he or she never received. (Id. ¶ 85.) In accordance with Chase policy, Gabrielian contacted Chase security to investigate these errors. (Id. ¶ 86.) Jose Elias, the member of Chase security investigating these errors, was scheduled to interview Plaintiff on March 11, 2013, but he was unable to speak with her until September because of her leave of absence. (Id. ¶¶ 86, 89.) Defendant states, but Plaintiff disputes, that, prior to her medical leave, Plaintiff spoke with two co-workers about the investigation into this transaction. (Id. ¶ 91; Pl. 56.1 ¶ 91.) Second, on March 7, 2013, an individual identifying himself as Yusef Salim called the branch and told Gabrielian that he had been in the branch the previous week to exchange money and that a teller had mistakenly given him an extra $1100.00. (Def. 56.1 ¶ 88.) On

March 12, 2013, Salim came to the branch and gave an envelope with $1100.00 to the teller. (Id.) Gabrielian tried to talk to him further but he left the branch immediately. (Id.) Finally, on March 6, 2013, in accordance with "Chase policy to audit a teller's cash box for the last day that they worked prior to going out on a leave of absence," Gabrielian found that Plaintiff's cash box was short $99.99, "despite the fact that [Plaintiff] had reported at the end of the day on March 6, 2013, that her cash box was balanced." (Id. ¶ 87.)

On September 6, 2013, after the conclusion of her leave of absence, Plaintiff met with Elias to discuss the February 25, 2013, transaction. (Id. ¶ 89.) Plaintiff signed a written statement acknowledging that she made errors by "rush[ing] through the transaction" and that she "did not put the proper denomination in the system" for the $1282.00 check. (Id. ¶ 90.) She did not, however, know what happened to the $1100.00 cash back. (Id.) Elias told Plaintiff about Salim returning to the bank with the $1100.00; Plaintiff denied knowing who this person was but said that it "could be her brother, because she had told her brother and sister about the situation, and her brother asked if the situation would be resolved if the money was returned." (Id. ¶ 92.)

Because of the errors with the February 25, 2013, transaction, Plaintiff's failure to balance her cash box upon assuming her leave of absence, and the fact that she was already on written warning, Chase's human resources department recommended terminating Plaintiff. (Id. ¶ 93.) Lesley Maier, the human resources business partner assigned to the situation involving Plaintiff, shared this recommendation with Gabrielian and Slocum. (Id. ¶ 94.) Gabrielian drafted a formal recommendation listing the reasons for Plaintiff's termination, which Maier reviewed, edited, and approved on September 20, 2013. (Id. ¶ 94.) Later that day, Gabrielian and Slocum called Plaintiff and informed her of her discharge and the reasons given therefor.

(Id. ¶ 95.) On October 1, 2013, Anna Michalek, who is approximately six years older than Plaintiff, was transferred to the Kings Highway branch to fill Plaintiff's position. (Id. ¶ 96.)

### B. Procedural History

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Compl. ¶ 8.) On October 27, 2014, she received a notice from the EEOC of her right to sue (Notice of Right to Sue (Dkt. 1 at ECF p.10)), and timely initiated the instant action asserting (1) national-origin-discrimination and retaliation claims under Title VII, the NYSHRL, and the HYCHRL; (2) age-discrimination claims under the ADEA; (3) unspecified violations of the ADA; and (4) interference claims under the FMLA. (Compl.)

Defendant now moves for summary judgment on each of Plaintiff's claims.[2] (Mot.) As to Plaintiff's discrimination claims, Chase contends that Plaintiff has failed to adduce evidence establishing either a prima facie case of or pretext for disparate treatment and that she has not met her burden to substantiate her hostile-environment claims. (Mem. at 9-19.) As to Plaintiff's retaliation claims, Chase contends that she has failed, at a minimum, to produce evidence that she engaged in protected conduct, and that she has failed to establish pretext. (Id. at 20-22.) Finally, Chase contends that Plaintiff's FMLA claims must be dismissed as time-barred and for failure to establish interference with her rights under that law. (Id. at 24-25.)

## II.  LEGAL STANDARD

A court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A 'material' fact is one capable of influencing the case's outcome under

---

[2] The fully briefed motion for summary judgment was filed on July 8, 2016. (See Mot.) Following the passing of Hon. Sandra L. Townes on February 8, 2018, this case was transferred to this court. (Feb. 21, 2018, Order Reassigning Case.)

governing substantive law, and a 'genuine' dispute is one as to which the evidence would permit a reasonable juror to find for the party opposing the motion." Figueroa v. Mazza, 825 F.3d 89, 98 (2d Cir. 2016) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "The movant may discharge this burden by showing that the non-moving party has 'fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co., 255 F. Supp. 3d 443, 451 (S.D.N.Y. Apr. 28, 2015) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). "'The mere existence of a scintilla of evidence' in support of the non-movant will be insufficient to defeat a summary judgment motion." Transflo Terminal Servs., Inc. v. Brooklyn Res. Recovery, Inc., 248 F. Supp. 3d 397, 399 (E.D.N.Y. 2017) (quoting Liberty Lobby, 477 U.S. at 252).

"In determining whether an issue is genuine, '[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion.'" SCW West LLC v. Westport Ins. Corp., 856 F. Supp. 2d 514, 521 (S.D.N.Y. 2012) (quoting Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995)). "[T]he judge's function is not [] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Redd v. N.Y. Div. of Parole, 678 F.3d 166, 173-74 (2d Cir. 2012) (quoting Liberty Lobby, 477 U.S. at 249). However, "[a] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," and "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted).

## III. DISCRIMINATION CLAIMS

### A. Disparate Treatment Claims Under Federal and State Law

Plaintiff claims disparate treatment on three grounds: (1) national-origin discrimination in violation of Title VII and the NYSHRL; (2) age discrimination in violation of the ADEA and the NYSHRL; and (3) disability discrimination in violation of the ADA and the NYSHRL. (Compl. at 2-4; see also Pl. Opp'n in Resp. to Mot. ("Pl. Opp'n") (Dkt. 36) at 5 (clarifying the claims asserted).)

#### 1. Legal Framework

Plaintiff's state and federal claims must be analyzed under the familiar three-step burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See, e.g., Concepcion v. City of New York, No. 15-CV-2156 (AJP), 2016 WL 386099, at *18 (S.D.N.Y. Jan. 29, 2016) (analyzing Title VII, ADEA, ADA, and NYSHRL claims under McDonnell Douglas).

Under the McDonnell Douglas framework, a plaintiff must first establish a prima facie case of employment discrimination. See Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). To prove a prima facie case, a plaintiff must show that: "(1) she is a member of a protected class; (2) her job performance was satisfactory; (3) she suffered adverse employment action; and (4) the action occurred under conditions giving rise to an inference of discrimination." Demoret v. Zegarelli, 451 F.3d 140, 151 (2d Cir. 2006) (citing McDonnell

Douglas, 411 U.S. at 802).[3]  "Generally speaking, a plaintiff's burden of establishing a prima facie case in the context of employment discrimination law is minimal."  Collins v. N.Y.C. Transit Auth., 305 F.3d 113, 118 (2d Cir. 2002) (quotation marks omitted).  If the plaintiff can establish a prima facie case of discrimination, "such a showing will raise a temporary 'presumption' of discriminatory motivation, shifting the burden of production to the employer and requiring the employer to come forward with its justification for the adverse employment action against the plaintiff."  Littlejohn v. City of New York, 795 F.3d 297, 307 (2d Cir. 2015) (citing Burdine, 450 U.S. at 253-54).  The employer satisfies this burden if it can proffer a "legitimate, nondiscriminatory" reason for the adverse action.  See Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 83 (2d Cir. 2015) (citing McDonnell Douglas, 411 U.S. at 802). "Plaintiff must then be afforded the opportunity to prove by a preponderance of the evidence that the defendant's proffered, nondiscriminatory reason was not its true reason for the employment decision, and that . . . discrimination was defendant's real motivation."  Dais v. Lane Bryant, Inc., No. 97-CV-2011, 2001 WL 1328390, at *2 (S.D.N.Y. Oct. 29, 2001) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993)).

The standard for establishing that the defendant's real motivation for the adverse employment action was discrimination varies by cause of action.  For a claim under Title VII, the comparatively lenient "mixed-motive" standard applies:  "An employee who alleges status-based discrimination under Title VII [must] . . . show that the motive to discriminate was one of the

---

[3] There are additional requirements under the ADA that are not relevant here.  To state a prima facie case of discrimination under the ADA, a plaintiff must demonstrate that (1) her employer is subject to the antidiscrimination provisions of the ADA; (2) she is disabled within the meaning of the ADA; (3) she is otherwise qualified to perform the duties of his job; and (4) an adverse employment action was taken against her because of her disability. Giordano v. City of New York, 274 F.3d 740, 747 (2d Cir. 2001) (citations omitted).  The difference is of no moment here, however, because neither party has addressed the first three prongs and, as explained below, Plaintiff has failed to establish either the fourth prong of her initial burden or pretext under the third step of the McDonnell Douglas framework.

employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 343 (2013) (emphasis added); see 42 U.S.C. § 2000e-2(m) ("[A]n unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."). Claims under the ADEA, however, are subject to a higher standard: "[A] plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision." Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 176 (2009) (emphasis added); see 29 U.S.C. § 623(a)(1) (prohibiting adverse employment actions that are undertaken "because of such individual's age" (emphasis added)). Following Gross, "it remains an open question in the Circuit whether 'but for' causation is required" in order to prove pretext under the ADA. Caesar v. Riverbay Corp., No. 15-CV-8911 (NRB), 2017 WL 6887597, at *8 (S.D.N.Y. Dec. 27, 2017); see Forrester v. Prison Health Servs., 651 F. App'x 27, 28 (2d Cir. 2016). The same is true for claims brought under the NYSHRL. See Barone v. S & N Auerbach Mgmt., Inc., 645 F. App'x 13, 14 (2d Cir. 2016) (stating that the Second Circuit has "assumed without deciding" that but-for causation is required for discrimination claims under the NYSHRL but that "[t]he issue has not been definitively resolved in the New York courts"). Nevertheless, the court will assume but not decide that the lower standard applies to the ADA and the NYSHRL because, as explained below, Plaintiff's claims cannot succeed even under that lower requirement.

2. Prima Facie Case

In accordance with the McDonnell Douglas framework, Plaintiff must first establish a prima facie case of discrimination. As stated above, this requires a showing that Plaintiff is a member of a protected class, that her job performance was satisfactory, that she suffered an

adverse employment action, and that the action occurred under conditions giving rise to an inference of discrimination. "A plaintiff's burden of establishing a prima facie case is de minimis." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 467 (2d Cir. 2001).

Here, it is undisputed that the plaintiff belongs to a protected class and was qualified for her position at Chase. With the first two prongs of the prima facie case satisfied, the court turns to the other two.

*a.*      *Adverse Employment Actions*

In the context of discrimination claims, "[a]n adverse employment action is a materially adverse change in the terms and conditions of employment." Mathirampuzha v. Potter, 548 F.3d 70, 78 (2d Cir. 2008) (citations and quotation marks omitted). "To be materially adverse, a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. Examples of such a change include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." Id. (quoting Sanders v. N.Y.C. Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004)).

Plaintiff contends that all instances in which she was treated worse than her co-workers in a way that "provides evidence of Defendant[']s discriminatory motivations" can serve as adverse employment actions for the purposes of this lawsuit. (Pl. Opp'n at 6.) This is incorrect. With the exception of Plaintiff's "demotion" to a part-time teller and subsequent termination, none of her poor interactions with Gabrielian rise to a level that can support a discrimination claim. (See id. at 6-8.) Plaintiff, in claiming that "an accumulation of 'seemingly minor incidents' may combine to establish an 'atmosphere of adverse employment action,'" misunderstands the

requirements for a disparate treatment action under federal and state discrimination law. (See Pl. Opp'n at 6 (first quoting Phillips v. Bowen, 278 F.3d 103, 109 (2d Cir. 2002); and then quoting Wanamaker v. Columbian Rope Co., 108 F.3d 462, 466 (2d Cir. 1997)).) Phillips, the case on which Plaintiff principally relies, dealt with a First Amendment retaliation claim, but "the standard for establishing an adverse action in a First Amendment retaliation claim is more inclusive than the standard of 'materially adverse change in the terms and conditions of employment' which is required in Title VII discrimination claims." Setelius v. Nat'l Grid Elec. Servs. LLC, No. 11-CV-5528 (MKB), 2014 WL 4773975, at *8 (E.D.N.Y. Sept. 24, 2014). Plaintiff's other citations also fail to establish that the atmosphere theory extends beyond retaliation claims.[4] In the context of discrimination claims under Title VII and other anti-discrimination statutes, "[w]ithout facts indicating an 'attendant negative result,'" such as demotion or termination, allegations that Gabrielian ordered Plaintiff to undertake embarrassing and inconvenient tasks—being exclusively asked to clean the lobby for the few weeks she served under Gabrielian as an assistant branch manager, being subject to excessive criticisms, being given a one-week assignment at another branch—cannot constitute an adverse employment action. See Henry v. N.Y.C. Health & Hosp. Corp., 18 F. Supp. 3d 396, 405 (S.D.N.Y. 2014) (quoting Gutierrez v. City of New York, 756 F. Supp. 2d 491, 506 (S.D.N.Y. 2010)); see also Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 570 (2d Cir. 2011) ("[C]riticism of an employee . . . is not an adverse employment action."); Dawson v. City of New York, No.

---

[4] The remaining cases cited by Plaintiff for her "atmosphere theory" are inapposite. Early v. Wyeth Pharmaceuticals, 603 F. Supp. 2d 556 (S.D.N.Y. 2009), simply "assum[ed] that the ability to aggregate events extend[ed]" to discrimination claims and held that the aggregated facts before it did not establish adverse employment action. Id. at 575. Wanamaker v. Columbian Rope Co., 108 F.3d 462 (2d Cir. 1997), also has no relevance here. There, in considering ADEA retaliation claims, the Second Circuit made no mention of aggregation and simply held that an employer's refusal to provide a terminated employee with an office and phone to accommodate his job search was not "sufficiently deleterious to constitute adverse employment action prohibited by the ADEA." Id. at 466.

09-CV-5348, 2013 WL 4504620, at *10 (S.D.N.Y. Aug. 19, 2013) ("[The plaintiff's] allegations of excessive scrutiny, monitoring, and criticisms of her job performance do not constitute an adverse employment action."). While the court declines to state that the "atmosphere" theory of adverse employment action can never support a disparate-treatment claim, but see Setelius, 2014 WL 4773975, at *8 (declining outright to apply the "atmosphere" theory to disparate-treatment claims), it is clear that the actions complained of by Plaintiff cannot form the necessary basis for such a claim.

The court finds that Plaintiff suffered only two adverse employment actions: her "demotion" to a part-time teller position; and her subsequent termination. The inquiry before the court is whether Plaintiff has established that either her position change or termination occurred under circumstances giving rise to a reasonable inference of discrimination.

> *b.    Circumstances Giving Rise to an Inference of Discrimination*

Finally, Plaintiff must be able to show that her adverse employment actions occurred under circumstances giving rise to an inference of discrimination.

First of all, no reasonable fact-finder could conclude that Plaintiff's "demotion" in January 2013 resulted from discrimination. As Plaintiff concedes, her position change resulted from her signing a "Position Change Request form" stating that she sought the change "voluntarily and of [her] own free will." (Pl. 56.1 ¶ 41.) As she also concedes, she had called human resources more than six months prior and stated that she was "willing to step down to a part time position" in order to accommodate her needs at home. (Def. 56.1 ¶ 27; Pl. 56.1 ¶ 27.) Plaintiff nevertheless contends she took the position "under duress," asserting that that she had no choice but to take a demotion in light of her personal obligation to "care for her ill daughter" each morning, which required her to arrive after the branch opened at 8:30 a.m. (Pl. Opp'n at 8.)

For several reasons, this "duress" argument fails to establish that her position change was motived by discrimination. It suffices here to note that Plaintiff initially requested a part-time position as early as April of 2012, nine months before her "demotion" and eight months before Gabrielian began her allegedly discriminatory treatment.

Likewise, Plaintiff has not established that her termination occurred under circumstances giving rise to an inference of discrimination. It is not clear how she intended to do so because she does not explain which items of evidence she deems proof of discrimination against specific protected classes (age, disability, or national origin). Rather, she simply recounts the events and actions generally and concludes that the sum establishes "inferior treatment" without explaining how such treatment was on account of her status as a member of any of the three protected classes underlying her claims. (See id. at 7.) Unraveling her theory of the case is therefore left to the court, and it appears to be as follows.

In support of her national-origin discrimination claim, Plaintiff appears to assert that proof of discrimination lies in a comparison of how Gabrielian treated her alongside Russian-speaking workers. More specifically, regarding her weeks-long tenure as an assistant manager under Gabrielian, she contends that circumstantial evidence of national-origin discrimination is established by (i) Gabrielian's asking her, and not Ida, to clean the lobby, (ii) Gabrielian's asking her, and not Ida, to cover at another branch during the week of Christmas, and (iii) that she was "tasked with the occasional duties of the duty of lifting, receiving, and unpacking all of the heavy supply boxes, while Ida was not." (Id. at 7-8.) Regarding her treatment compared to the three other tellers—only two of whom were of "Russian descent"—Plaintiff asserts that an inference of discrimination arises from the fact that (i) she alone was denied the chance to temporarily leave the store to feed a parking meter, (ii) she alone was coached in a back room referred to as

the "detention room," (iii) Gabrielian scrutinized her time sheet and attendance without doing so for the others, and (iv) Gabrielian allowed others to take breaks at a doughnut shop "but did not afford Plaintiff the same opportunities." (Id. at 9.)

Her arguments based on other protected classes are less clear. In support of her age-based discrimination claim, Plaintiff appears to rely on (i) the fact that Gabrielian was younger than her, and (ii) Gabrielian's use of Russian terms for "old lady" and "witch" when referring to Plaintiff. Regarding her claims of discrimination on account of disability, Plaintiff's brief says virtually nothing. She appears to suggest that her anxiety and depression constitute a disability and the basis for her termination, but she makes no mention of how she intends to prove that claim. Plaintiff also generally emphasizes that Gabrielian drafted the formal "Recommendation to Terminate," suggesting that this involvement is also proof of discrimination on account of each protected class. (Id. at 10-11.)

Resting on this sparse record and these vague assertions, Plaintiff has failed to meet her prima facie burden to establish grounds for a reasonable inference of discrimination based on any protected class. Regarding her age-based claim, Plaintiff's only assertions in support of such an inference are that Gabrielian allegedly referred to Plaintiff as "babushka" (the Russian word for "old lady"), and that Gabrielian is younger than Plaintiff. (See Pl. Opp'n at 7, 20.) Plaintiff additionally claims in her response that Gabrielian had said that Plaintiff was "too old to work" (id. at 9) but without any support for this allegation in the record the court will not consider it. (See Def. Reply Mem. of Law in Supp. of Mot. ("Def. Reply") (Dkt. 37) at 3.) Regardless, the allegations in the record do not create an inference of discrimination. Stray remarks, even if made by a decisionmaker, "do not constitute sufficient evidence to make out a case of employment discrimination . . . without more . . . ." Danzer v. Norden Sys., Inc., 151 F.3d 50, 56

(2d Cir. 1998). At the very least, the six-month period of time between March 2013 and

Plaintiff's termination in September renders any such remarks too attenuated to constitute

evidence discrimination without other evidence. See Ellis v. Century 21 Dep't Stores, 975 F.

Supp. 2d 244, 276 (E.D.N.Y. 2013) ("[C]ourts in this Circuit have generally found that a five

month lapse between an allegedly discriminatory statement and an adverse employment action is

too long a gap to find the remark probative of discrimination without some other evidence that

the remark was related to the adverse employment action."). Even still, Plaintiff does not allege

that the remark was ever made in relation to the decision to demote or terminate Plaintiff, nor

does she allege that Gabrielian ever used this term in the context of either of these adverse

actions. The conclusion that this evidence does not create an inference of discrimination

becomes even clearer in light of the fact that the Plaintiff's replacement was six years older than

Plaintiff (Def. 56.1 ¶ 96). See Meyer v. McDonald, 241 F. Supp. 3d 379, 391 (E.D.N.Y. 2017)

(Weinstein, J.) ("An inference against discrimination is appropriate when the individual hired to

replace plaintiff alleging discrimination is within the same protected class as plaintiff."').

Plaintiff's claim that there is an inference of discrimination from the fact that Gabrielian is

"younger" than Plaintiff (Pl. Opp'n at 7) also fails because, as far as the court is aware, there is

no record evidence concerning Gabrielian's age.

 For similar reasons, Plaintiff has failed to establish an inference of discrimination based

on her national origin. Plaintiff's only evidence in favor of her claim of national origin

discrimination is that Gabrielian "spoke ill of Plaintiff, in Russian, to Plaintiff's Russian

similarly situated co-workers." (Pl. Opp'n at 20.) First, the court notes that Plaintiff has not

asserted that Gabrielian made any specific statements discriminating against Plaintiff on the basis

of her national origin, something that the court considers fatal to her claim. Second, even if

Plaintiff were correct that she can assert a claim of national-origin discrimination based solely on the fact that Gabrielian spoke ill of Plaintiff in Russian, no reasonable fact-finder could conclude that an inference of discrimination on that basis is available here. Similar to the court's analysis in the context of Plaintiff's age-discrimination claims, nothing about these stray remarks establishes an inference of discrimination: These facts have little if any probative value on their own and, in any event, fail to establish that either of the adverse employment actions "occurred under conditions giving rise to an inference of discrimination." Demoret, 451 F.3d at 151. Plaintiff has in no way articulated how these stray comments related to her termination or her "demotion." See, e.g., Woodard v. TWC Media Sols., Inc., No. 09-CV-3000 (BSJ), 2011 WL 70386, at *7 (S.D.N.Y. Jan. 4, 2011) (holding that the plaintiff failed to establish a prima facie case because she had "not demonstrated how such comments affected or were related to the termination decision"), aff'd sub nom. Lawless v. TWC Media Sols., Inc., 487 F. App'x 613 (2d Cir. 2012).

Finally, Plaintiff has articulated no basis for an inference of discrimination based on her disability. Indeed, other than alleging that she is disabled, she barely mentioned that protected status in her filings.

Under these circumstances, Plaintiff has failed to make out a prima facie case of discrimination on account of her age, national origin, or alleged disability. For these reasons, summary judgment must be granted on her disparate treatment claims under state and federal law.

3.     Pretext

Additionally, even if Plaintiff had made out a prima facie case on these claims, she has nevertheless failed to establish pretext. Chase has proffered legitimate reasons which, if "taken

as true, would permit the conclusion that there was a nondiscriminatory reason" for the adverse actions taken against her. Hicks, 509 U.S. at 509. Chase asserts that it terminated Plaintiff because of the incorrectly processed check and cash-back transactions, as well as her failure to balance her cash box. (Mem. at 12-13.) The burden to prove that these reasons were pretext for Chase's allegedly discriminatory adverse actions therefore shifts to Plaintiff. She has not met that burden for much the same reasons she failed to establish a reasonable inference of discrimination. Plaintiff does not refer to any evidence that her termination was motivated by discriminatory intent beyond that which she generally asserted in favor of her prima facie burden. Instead, she emphasizes that at the time of her check-processing error she suffered from "extreme anxiety and depression necessitating a medical leave" and asserts that "it should be attributed that [her infractions] were the result of Plaintiff's diminished mental and emotional state at the time, the same diminished emotional state that necessitated her leave of absence for a period of approximately eight (8) months." (Pl. Opp'n at 12.) She also vaguely contends that Gabrielian's involvement in her termination established discriminatory motive. (See id. at 10.) Neither argument establishes pretext. That Plaintiff suffered from anxiety may indeed explain why her infractions came to pass, but it has no relevance to Defendant's motivation in terminating her employment. Likewise, that Meier, who recommended dismissal, reviewed information provided by Gabrielian does not establish animus or suggest pretext, nor does the fact that Gabrielian drafted the dismissal notice at Meier's request. That Gabrielian was involved in Plaintiff's dismissal does not establish pretext without some positive proof of animus, which has not been produced here.

## B.    Disparate Treatment Claims Under City Law

"[C]ourts must analyze NYCHRL claims separately and independently from any federal

and state law claims." Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013). "[T]he NYCHRL is reviewed . . . more liberally than federal or state discrimination claims, but a plaintiff still must prove 'the conduct is caused at least in part by discriminatory or retaliatory motives.'" Fenner v. News Corp., No. 09-CV-9832 (LGS), 2013 WL 6244156, at *17 (S.D.N.Y. Dec. 2, 2013) (quoting Mihalik, 715 F.3d at 113). Still, "the NYCHRL is not a general civility code." Mihalik, 715 F.3d at 110 (quotation marks omitted). "The plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive. . . . She must show that she has been treated less well at least in part because of her [membership in a protected class]." Id. (quotation marks omitted).

Some courts have gone so far as to hold that the city statute does not require an adverse employment action and that a plaintiff must only provide evidence she was treated "less well" than other employees based on her protected status. See, e.g., Williams v. Regus Mgmt. Grp., LLC, 836 F. Supp. 2d 159, 173 (S.D.N.Y. 2011); Zambrano-Lamhaouhi v. N.Y.C. Bd. of Educ., 866 F. Supp. 2d 147, 160 (E.D.N.Y. 2011). Despite this lower standard, a moving defendant is entitled to summary judgment upon showing, as an affirmative defense, that a reasonable jury could not interpret the alleged discrimination as anything more than "petty slights or trivial inconveniences." Mihalik, 715 F.3d at 114. For the same reasons as addressed above, Defendant has met that burden here.

Accordingly, Chase's motion for summary judgment as to Plaintiff's disparate treatment claims is GRANTED.

## C.  Hostile Environment Claims

Plaintiff also asserts claims for a hostile work environment under Title VII, the ADEA, the NYSHRL, and the NYCHRL. Her state and federal claims are analyzed under the same

standard. Fordham v. Islip Union Free Sch. Dist., 662 F. Supp. 2d 261, 271 (E.D.N.Y. 2009) (citing Quinn v. Green Tree Credit Corp., 159 F.3d 759, 765 (2d Cir. 1998)). Under those statutes, a hostile work environment claim requires a showing that "(1) 'the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and (2) 'a specific basis exists for imputing the conduct that created the hostile environment to the employer.'" Lekettey v. City of New York, 637 F. App'x 659, 661 (2d Cir. 2016) (alteration in original) (quoting Howley v. Town of Stratford, 217 F.3d 141, 153-54 (2d Cir. 2000)). "This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." Littlejohn, 795 F.3d at 321 (quotation marks omitted). That is, "unless an incident of harassment is sufficiently severe, 'incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 102 (2d Cir. 2010) (quoting Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002)). "Among the factors [that courts] consider are 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with [the] employee's work performance.'" Feingold v. New York, 366 F.3d 138, 150 (2d Cir. 2004) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)). "It is axiomatic that the plaintiff also must show that the hostile conduct occurred because of a protected characteristic." Tolbert v. Smith, 790 F.3d 427, 439 (2d Cir. 2015).

The incidents that purportedly constitute a hostile environment are all attributed to

Gabrielian and identical to those Plaintiff asserts in support of her theory of an "atmosphere of adverse action": (i) lobby cleaning assignments, (ii) covering for one week at another branch, (iii) unpacking branch supplies, (iv) picayune coaching, often in a room referred to as the "detention room" by Chase employees, (v) scrutiny of Plaintiff's attendance and tardiness, (vi) refusal to allow Plaintiff to feed her parking meter while allowing others to take coffee breaks, and (vii) frequent name-calling in Russian, a language Plaintiff did not speak. (Pl. Opp'n at 16-18.)

Assessing "the totality of the circumstances," Gorzynski, 596 F.3d at 102, the court finds that Plaintiff cannot establish a hostile-environment claim. First, the events Plaintiff sets out were not sufficiently severe or pervasive to support her claim. While the allegations may have been annoying to Plaintiff, no single incident comes close to having been "extraordinarily severe," see Alfano, 294 F.3d at 374. While Plaintiff has alleged incidents that were "continuous and concerted," the court is unable to conclude, as it must to allow Plaintiff's claim to proceed, that this series of incidents "altered the conditions of her working environment." See id. The conduct was not facially discriminatory or excessive; rather, the record indicates "only limited [and] infrequent" conduct that could, at worst, be described as "mildly offensive" and that cannot support Plaintiff's hostile-environment claim. See Cristofaro v. Lake Shore Cent. Sch. Dist., 473 F. App'x 28, 30 (2d Cir. 2012) (summary order).

The Court also concludes that Plaintiff has not established that any of these actions occurred on account of a protected status. As with her disparate-treatment claims, Plaintiff does not explain which evidence she offers as proof of mistreatment "on account of" her particular protected classes. Read liberally, her brief implicitly attempts to show that Gabrielian's mistreatment occurred "on account of" her national origin in two ways. First, she points to the

favorable treatment of her colleagues—Ida, when Plaintiff served for several weeks as assistant manager under Gabrielian; and three other tellers, two of whom she identifies as "Russian," during her approximately two-month tenure as a part-time teller. Second, she points to Gabrielian's use of the Russian words for "old lady" and "witch." Yet, as Plaintiff concedes, Ida was many years her senior, and one of her fellow tellers was non-Russian and identified as African American. Plaintiff thus provides no articulable proof that Gabrielian's treatment was motivated by her national origin. That three of four co-workers were of a different national origin and did not experience the same minimally offensive mistreatment does not establish a nexus with Plaintiff's national origin. See, e.g., Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842 F.2d 590, 594 (2d Cir. 1988) ("The fact that a white woman was chosen from a pool of candidates that included several black individuals does not by itself indicate that Columbia's selection process was racially discriminatory.").

As for her age-based hostile-environment claim, while Gabrielian's use of the Russian word for "old lady" is reasonably deemed age-related, no reasonable juror could conclude on that basis alone that the alleged mistreatment was on account of her age, especially when considering that Ida—Plaintiff's key comparator—was twelve years her senior and that her teller position was filled by someone six years her senior. For these reasons, and in light of the totality of the circumstances, the court finds that Plaintiff fails to demonstrate that a rational trier of fact could conclude that Chase subjected her to a hostile work environment in violation of federal or state law.

Finally, Plaintiff's NYCHRL hostile-environment claim fails for similar reasons. Under the NYCHRL, a plaintiff need not demonstrate that the treatment was "severe or pervasive." Barounis v. N.Y.C. Police Dep't, No. 10-CV-2631 (SAS), 2012 WL 6194190, at *9 (S.D.N.Y.

Dec. 12, 2012) (quoting Williams v. N.Y.C. Hous. Auth., 872 N.Y.S.2d 27, 39 (App. Div. 2009)). Instead, the plaintiff need only show that she has been "treated less well than other employees because of" her protected class. Id. However, even if the plaintiff points to evidence of unequal treatment, the defendant can prevail on summary judgment by proving that the conduct in question "could only be reasonably interpreted by a trier of fact as representing no more than petty slights or trivial inconveniences." Williams 872 N.Y.S.2d at 41. "The NYCHRL . . . is not a 'general civility code' and 'petty slights and trivial inconveniences' are not actionable under it." Barounis, 2012 WL 6194190, at *9 (internal citations omitted) (first quoting Williams, 872 N.Y.S.2d at 40; and then quoting id. at 41). For the same reasons as explained above, the court finds that the conduct alleged by Plaintiff does not rise above the level of "petty slights and trivial inconveniences," and that Plaintiff has not raised a triable issue as to whether this conduct occurred at least in part because of Plaintiff's age or national origin.

Accordingly, Chase's motion for summary judgment as to Plaintiff's hostile-environment claims is GRANTED.

## IV. RETALIATION CLAIMS

Plaintiff's federal- and state-law retaliation claims are, like her discrimination claims, reviewed under the burden-shifting approach of McDonnell Douglas. See Kwan v. Andalex Grp. LLC, 737 F.3d 834, 843 (2d Cir. 2013). To establish a prima facie case for retaliation, Plaintiff must show (1) participation in a protected activity; (2) the defendant's knowledge of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. Id. at 844 (citing Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005)). As with discrimination claims, if Plaintiff meets her prima facie burden, Defendant must then "demonstrate that a legitimate, non-

retaliatory reason existed for its action[s]." Lennert-Gonzalez v. Delta Airlines, Inc., No. 11-CV-1459 (JMF), 2013 WL 754710, at *9 (S.D.N.Y. Feb. 28, 2013). Once Defendant does so, the burden shifts back to Plaintiff, who must ultimately establish that Defendant's "action was, in fact, motivated by discriminatory retaliation." Id. "Only where an employer's business decision is so implausible as to call into question its genuineness should this [c]ourt conclude that a reasonable trier of fact could find that it is pretextual." Fleming v. MaxMara USA, Inc., 371 F. App'x 115, 118 (2d Cir. 2010) (summary order) (citing Dister v. Cont'l Grp., Inc., 859 F.2d 1108, 1116 (2d Cir. 1988)).

Insofar as Plaintiff's claim rests on any stray remarks made by Gabrielian or other Chase employees, as discussed above, these remarks are insufficient to raise an inference of retaliation. See Alexander v. Bd. of Educ., 107 F. Supp. 3d 323, 330 (S.D.N.Y. 2015). Plaintiff has not put forth any evidence suggesting that these remarks establish retaliatory intent, nor has she plausibly connected these remarks to any adverse actions she suffered.

Even assuming that Plaintiff has met her prima facie burden, she has nevertheless failed to establish the pretextual nature of any adverse actions against her. Chase has proffered legitimate reasons for her termination: Plaintiff incorrectly processed a check by omitting over $1000 dollars in value, causing a shortfall in a customer's account by the same amount; and an audit of Plaintiff's cash box revealed an unreported imbalance. (See Mem. at 23.) The burden to prove that these reasons were pretextual therefore falls on Plaintiff. She has not met that burden here, nor has she even addressed it. Instead, she expressly refers the court to the section of her brief arguing that the reasons given for her termination were pretext for discrimination, rather than retaliation, and nominally "repeats her arguments" made on that issue. (Pl. Opp'n at 22.) As an initial matter, the court notes that this tactic confuses two distinct standards. Establishing

pretext for discrimination claims requires showing a showing of <u>discriminatory</u> motive, whereas

establishing pretext for retaliation claims requires a showing of <u>retaliatory</u> motive. Establishing

the former by no means establishes the latter. Moreover, even if establishing that age-based or

national-origin animus could, for reasons Plaintiff has not explained, establish a motive to

retaliate against protected activity, Plaintiff has not done so here because she has failed to meet

her burden to show that her termination was based on discriminatory animus in the first instance.

Plaintiff's lack of evidence "demonstrating pretext" or "that retaliation was the but-for cause of

her termination" is fatal to her retaliation claim under federal and state law. See <u>Varno v.</u>

<u>Canfield</u>, 664 F. App'x 63, 66 (2d Cir. 2016) (summary order).

The NYCHRL's retaliation provision "protect[s] plaintiffs who oppose any practice

forbidden under the law from conduct reasonably likely to deter a person engaging in such

action." <u>Chen v. City Univ. of N.Y.</u>, 805 F.3d 59, 76 (2d Cir. 2015) (alteration adopted)

(quotation marks omitted). In order to succeed on her claim, Plaintiff must be able to show that

Gabrielian or another Chase decisionmaker "engaged in some prohibited conduct" and that the

"decision to do so was caused at least in part by retaliatory motives." <u>Id.</u> (alteration adopted)

(quotation marks omitted).

Plaintiff has failed to meet this standard because, first, she has not presented evidence

that Gabrielian engaged in any conduct "reasonably likely to deter a person" from complaining

about NYCHRL violations after Plaintiff complained to Gabrielian and Wilson. The January 16,

2013, "demotion" preceded Plaintiff's conversations with Gabrielian and Wilson, which

occurred from late January through March 2013. (<u>See</u> Def. 56.1 ¶¶ 67-69, 73.) Her termination

in September 2013 did come after her complaints, but the court notes the six-month gap between

the complaints and the adverse action, and it finds that such a temporal gap, without further

evidence linking the two events, defeats Plaintiff's argument that the termination would be "reasonably likely to deter" other complaints. See Davis v. Metro. Trans. Auth., No. 07-CV-3561 (DAB), 2012 WL 727696, at *10 (S.D.N.Y. Mar. 6, 2012).[5] It is also significant that Chase has shown that Plaintiff was informed about issues with her performance prior January 2013, when she made her complaints. (See Def. 56.1 ¶¶ 21-29.) Compare Mihalik, 715 F.3d at 116 (denying summary judgment where the defendant "presented no evidence that anyone confronted [the plaintiff]" about performance problems until after she complained), with Chen, 805 F.3d at 77 (granting summary judgment where an employee of the defendant "expressed [concerns about the plaintiff's performance] in a professional evaluation long before [the plaintiff's] complaint"). These facts, combined with the legitimate reasons Chase had for terminating Plaintiff, lead the court to conclude that Plaintiff has not presented facts from which a reasonable jury could find that her "demotion" and termination were "motivated, in part, by retaliation." See Chen, at 77.

Accordingly, Chase's motion for summary judgment as to Plaintiff's claims of retaliation is GRANTED.

## V.    CLAIMS UNDER THE FMLA

### A.    Relevant Facts

As alleged in her complaint, Plaintiff contends that she "requested intermittent FMLA leave to accommodate [her] absences associated with her daughter's medical treatment" and that Chase "refused to accommodate [her] request" and "forced Plaintiff to take a full three months of FMLA leave commencing in July 2012." (Compl. ¶ 19.) With assumptions drawn in Plaintiff's favor, the disputed and undisputed facts relating to her FMLA claim are as follows.

Plaintiff does not dispute that, during her employment at Chase, the company maintained

---

[5] This same reasoning serves to sever the causal link between Plaintiff's complaints and her termination for purposes of a retaliation claim under state and federal law. See Davis, 2012 WL 727696, at *10.

an FMLA policy that provided instructions for requesting FMLA leave and described relevant employee responsibilities. (Def. 56.1 ¶ 14; see also Chase FMLA Policy (Dkt. 34-1 at ECF p.11) at ECF p.12.) That policy advises employees that, after a Chase manager receives notice of an employee's intent to take either intermittent or continuous FMLA leave, notice is forwarded to a human resources "FMLA Unit," which then sends the requesting employee a "leave packet" with instructions for formally requesting FMLA leave. (Chase FMLA Policy at ECF pp.14-15.) The policy also provides that approval of FMLA leave requires and "depends on" medical information verified by a physician in a certification form accompanying the leave packet. (Id. at ECF p.15.) The policy also provides that "the role of the FMLA Unit . . . is to review the medical certification you provide and determine if the time off qualifies under this policy. This Unit is also responsible for communicating whether or not the time off is covered under this policy to both you and your manager." (Id. at ECF p.16.)

On June 30, 2012, Jene'e A. Walker of the FMLA Unit wrote to Plaintiff, advising that the FMLA Unit had been apprised of her "need for leave" five days earlier. (June 30, 2012, Letter from Chase Disability Mgmt. Servs. (Dkt. 35-1 at ECF p.1) at ECF p.2.) Walker's letter also advised Plaintiff that she had satisfied certain threshold eligibility requirements and that, pending completion of an attached certification form, approval or denial of her leave request would be communicated at a later date. (Id. at ECF pp.2-3.) Neither the letter nor Walker's declaration clarified when and from whom she received notice of Plaintiff's initial inquiry, but Plaintiff's deposition testimony suggests that she initially requested "time off" to oversee her daughter's treatment earlier that month, when she spoke to her Branch Manager, Marina Ishakova. (Pl. Dep. Tr. 72:17-23.) On that point, Plaintiff testified in vague terms that she had first asked Ishakova for "time off," rather than leave. (Id.) When asked when she took her 12-

week leave, Plaintiff abruptly asserted that she had never asked for and in fact "didn't want leave." (Id.) When asked who told her she "had to take" a three-month leave, she testified that Ishakova told her that their district manager, Erica Slocum, had said that Plaintiff "could take three months off." (Id. 73:19-23 (emphasis added).) Plaintiff then repeated that she did not "want to take three months off," and that she was told she that she "ha[d] to take it, that they put it in the system and [she] ha[d] to take it." (Id. 73:24-74:7.) She did not state, however, who told her this, when, or what "system" she referred to, and defense counsel taking her deposition did not ask for that information or otherwise pursue the topic. At odds with her assertion that she was told she "had to take" 12 weeks of continuous leave, on the other hand, Plaintiff's testimony often describes being told that she "could," rather than "had to," take a full leave. (See, e.g., id. 73:21-23; id. 78:24-79 ("[W]hen I asked them for time off . . . the manager told me that the district manager said you could take three months off . . . ."); id. 83:1-7 ("All I know, I was told that I got three months off. I could take three months off.").)

In any event, Plaintiff also testified that she did not know that she was "allowed" to take intermittent leave until she met with her daughter's doctor on July 10, 2012. (Id. 77:16 - 78:10.) On that date, after Plaintiff provided the doctor with the certification form that the Chase FMLA Unit had provided her, the doctor purportedly explained that Plaintiff did not need a continuous 12-week leave to care for her daughter and that "occasional time off" to take her daughter for doctor's visits, blood tests, etc., would suffice. (Id. 78:10-79:25.) The doctor also suggested that Plaintiff was legally entitled to intermittent leave. (Id.) Plaintiff's certification form nevertheless did not include a request for intermittent leave. (Def. 56.1 ¶¶ 15-16.) Rather, it listed "3-6 months" as the "estimated period of time care is needed or during which the employee's presence would be beneficial." (Pl. Certification of Health Care Provider (Dkt. 35-1

at ECF p.4) at ECF p.6.) In response to the prompt, "State the care you will provide your family member and provide an estimate of the time period during which the care will be provided, including a schedule if leave is to be taken intermittently or on a reduced work schedule," Plaintiff's certification form stated that the purpose of her leave was to "[p]rovide [her daughter] with necessary medication, monitoring her diet, keep her away from getting infected[, m]onitor her urine/blood pressure," and provided no schedule for intermittent leave. (Id. at ECF p.5.) Immediately beneath her request for "3-6 months" of leave, the certification form instructed Plaintiff to answer several questions if she was "asking for intermittent leave or a reduced work schedule," but that section was left blank. (Id. at ECF p.6.) When asked why the doctor signed her certification form in that state—requesting a full 12-week continuous leave despite the doctor's admonitions that continuous leave was unnecessary—Plaintiff testified that it was because Chase had "already grant[ed 12-weeks] to me." (Pl. Dep. Tr. 79:14-25.)

In response to further questioning, Plaintiff claimed that she called Ishakova shortly after the doctor's visit with the intent to request intermittent leave, but Ishakova refused to engage on the matter, stating "sorry, Mattie, I can't talk to you. You're on FMLA [leave], we're not allowed to talk to employees." (Id. 79:18-80:9.) Plaintiff further testified that at a later, unspecified point she also called Chase's human resources department to adjust her leave to an intermittent basis, but she offered no details beyond the fact that she called and was not asked to provide any. (See id. 82:3-83:18.)

Finally, despite this testimony, Plaintiff does not dispute that Chase "[b]ased" its decision to grant her a twelve-week continuous leave on the information she provided in her certification form. Nor does she dispute that Chase, as a general matter, bases "its decision whether to grant FMLA leave, including the decision . . . to grant FMLA leave on an intermittent basis, on the

information included" in the same certification form. (Def. 56.1 ¶ 19; Pl. 56.1 ¶¶ 19-20.)

## B.  Applicable Law and Analysis

"The FMLA gives eligible employees an 'entitlement' to twelve workweeks per year of unpaid leave '[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee.'" Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 174 (2d Cir. 2006) (quoting 29 U.S.C. § 2612(a)(1)(D)).  As an alternative to full-time leave, an employee may take intermittent or part-time leave when medically necessary.  29 U.S.C. § 2612(b)(1).  Section 2615(a)(1) of the FMLA provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter," 29 U.S.C. § 2615(a)(1), creating "a private right of action to seek both equitable relief and money damages against any employer . . . should that employer interfere with, restrain, or deny the exercise of FMLA rights," Sista, 445 F.3d at 174 (citing Nev. Dep't of Human Res. v. Hibbs, 538 U.S. 721, 724-25 (2003)).  "[T]o prevail on a claim of interference with her FMLA rights, a plaintiff must establish [among other things] . . . that she was denied benefits to which she was entitled under the FMLA."  Graziadio v. Culinary Inst. of Am., 817 F.3d 415, 424 (2d Cir. 2016).

The ordinary limitations period for FMLA interference claims is two years.  See 29 U.S.C. § 2617(c)(1).  However, a three-year limitations period exists for willful FMLA violations.  See id. § 2617(c)(2).  Both statutes run from the date of the "last event constituting the alleged violation for which the action is brought.  Id. § 2617(c)(1), (c)(2).  An FMLA violation is willful if an employer either knew or recklessly disregarded whether its conduct violated the FMLA.  See Porter v. N.Y. Univ. Sch. of Law, 392 F.3d 530, 531-32 (2d Cir. 2004) (per curiam).  "An employer acts willfully under the FMLA when it 'knew or showed reckless

disregard for the matter of whether its conduct was prohibited by the FMLA.'" Riddle v.

Citigroup, 449 F. App'x 66, 70 (2d Cir. 2011) (summary order) (alteration adopted) (quoting

Porter, 392 F.3d at 531).

Here, Plaintiff initiated this suit on January 23, 2015 (Compl.), approximately two-and-a-

half years after she returned from her 12-week FMLA leave on October 7, 2012 (see Def. 56.1

¶¶ 13, 20). The last event constituting an alleged violation of Plaintiff's FMLA rights occurred

in the summer of 2012, when Plaintiff applied for and received her FMLA leave. (See Compl.

¶ 19.) Her claim is therefore timely only if she has established that Chase willfully interfered

with her FMLA rights. The court concludes that she has not.

Assuming but not deciding that Plaintiff raised a genuine dispute of material fact

concerning Chase's denial of her right to intermittent leave under the FMLA, she has

nevertheless failed to meet her burden to establish that any denial was willful. As an initial

matter, Plaintiff fatally undermines her claim of willfulness by conceding that Chase based its

determination of her leave request on her certification form, which made no request for

intermittent leave and explicitly requested twelve continuous weeks off. Chase was, moreover,

entitled to rely on the information provided in that certification form. See 29 C.F.R. § 825.305

("An employer may require that an employee's leave . . . be supported by a certification issued

by the health care provider of the employee or the employee's family member."); 29 C.F.R.

§ 825.306 ("In all instances in which certification is requested, it is the employee's responsibility

to provide the employer with complete and sufficient certification and failure to do so may result

in the denial of FMLA leave."). Moreover, when intermittent leave is sought, as it allegedly was

here, employers may require that certification forms contain information sufficient to establish

"the medical necessity for . . . intermittent or reduced schedule leave and an estimate of the dates

and duration of such treatments and any periods of recovery." 29 C.F.R. § 825.306(a)(6). Chase's FMLA certification form solicited exactly this information, yet neither Plaintiff nor the verifying doctor provided it when completing that form.

Plaintiff's testimony—the only evidence offered in support of her FMLA claim—does not establish willfulness. By vaguely testifying that her branch manager had said that she "could" and "had to" take a continuous leave, Plaintiff does not contradict another fundamental fact that she elsewhere concedes—that Chase adhered to its normal policy when basing its leave decision on her certification form. (See Pl. 56.1 ¶¶ 19-20.) Indeed, the allegation that her manager "denied" her request for intermittent leave is even further undermined by her testimony suggesting that she did not know that intermittent leave was available until she took her certification form to her daughter's doctor. (Pl. Dep. Tr. 77:16-78:10.) In short, where Plaintiff concedes that Chase relied on her certification form according to its usual practice, and where Chase had a legal right to do so, Plaintiff cannot plausibly maintain that any "denial" of her right to take intermittent leave was willful. Plaintiff's testimony asserting at times that she was told she "had to" take continuous leave is not enough under these circumstances to establish willfulness, considering that she made no request for any other type of leave on the certification form on which Chase indisputably relied. Because Plaintiff has not "introduce[d] evidence sufficient to support a finding of willfulness," her FMLA claims are time-barred and must be dismissed. See Riddle, 449 F. App'x at 70.

Accordingly, Chase's motion for summary judgment as to Plaintiff's claims under the FMLA is GRANTED.

## VI.    CONCLUSION

For the foregoing reasons, the court GRANTS Chase's motion for summary judgment

(Dkt. 30).  The Clerk of Court is respectfully directed to enter judgment and close the case.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
       May 2, 2018

NICHOLAS G. GARAUFIS
United States District Judge